UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

SHAUN P. DUERR, individually and as next friend of N.D., a minor,
Plaintiff,

v.

EAU CLAIRE COUNTY DEPARTMENT OF HUMAN SERVICES;
TERRI BOHL, Operations Administrator, in her official and individual capacities;
MELISSA CHRISTOPHERSON, Administrator of Family Services, in her official and
individual capacities;
TASHA ALEXANDER, CPS Manager, in her official and individual capacities;
JOHN/JANE DOES 1–10,

Defendants.

Case No. 26-cv-285

---

## COMPLAINT

---

## I. INTRODUCTION

1. This case arises from a county child-protection agency's repeated issuance of official screening determinations, classification decisions, and recordkeeping practices that collectively structured and communicated an informational environment in which documented risks to a minor child were systematically characterized as not warranting intervention.

2. Between May 2025 and early 2026, Plaintiff submitted multiple reports to CPS documenting emotional harm, disruption of services, denial of educational evaluations, and observable regression in the child's functioning. In response, Defendants issued screening determinations stating that the reported conditions did not meet criteria for intervention, while classifying or excluding additional submissions containing new and corroborating information.

3. These determinations and classification practices did not operate in isolation. They defined what information was recorded, preserved, and communicated within systems that relied on CPS determinations, including ongoing family court proceedings involving the child.

4. During this same period, information derived from a CPS report submitted by or on behalf of the other parent was incorporated into family court proceedings, while Plaintiff's repeated reports and supporting documentation were screened out, classified as duplicative, or not incorporated into CPS records.

5. By issuing repeated determinations that no threatened harm existed, while selectively recording and classifying information, Defendants created and maintained an informational environment in which documented risks were systematically minimized and unverified allegations were permitted to function as indicators of credibility and risk.

6. These actions altered the informational landscape in which decisions regarding the child were made and contributed to the continuation of conditions in which the child did not receive evaluation, intervention, or protective oversight despite documented need.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the Fourteenth Amendment.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in the Western District of Wisconsin.

## III. PARTIES

9. **Plaintiff Shaun P. Duerr** is a resident of Minnesota and the father of N.D. He engaged in protected reporting on behalf of his child.

10. **Plaintiff N.D.** is a minor child entitled to protections under the Fourteenth Amendment. As a result of Defendants' conduct, she was deprived of timely child-protection review, medical and educational evaluations, and corrective state action while harm escalated.

11. **Defendant Eau Claire County Department of Human Services** is a municipal agency responsible for child protective services and acts under color of state law.

12. **Defendant Terri Bohl**, at all relevant times, was Operations Administrator for DHS and exercised supervisory authority over CPS intake, screening, grievance handling, and corrective action.

13. **Defendant Melissa Christopherson**, at all relevant times, was Administrator of Family Services and responsible for oversight of CPS screening decisions and responses to escalations.

14. **Defendant Tasha Alexander**, at all relevant times, was a CPS Manager responsible for oversight of CPS screening determinations and related classification practices. In that role, Defendant Alexander participated in or was responsible for the screening decisions and classification practices described herein.

15. **John/Jane Does 1–10** are additional DHS or CPS officials whose identities are presently unknown and who participated in or ratified the conduct alleged.

16. Plaintiff Shaun P. Duerr is the biological parent of N.D. and brings claims on her behalf as next friend pursuant to Federal Rule of Civil Procedure 17(c)(2). N.D. is a minor and lacks legal capacity to sue on her own behalf. No other person with the ability or willingness to pursue these claims on her behalf is available.

## IV. FACTUAL ALLEGATIONS

### A. May–June 2025 – Initial Reports and Screening Determinations

17. Between May 2025 and June 2025, Plaintiff submitted multiple reports to CPS describing concerns regarding N.D., including emotional distress, disruption of services, and changes in behavior and functioning.
18. These reports included supporting materials, including communications from providers, observations from educators, and descriptions of the child's condition.
19. CPS issued screening determinations on these reports stating that the information provided did not meet criteria for CPS intervention or did not establish threatened harm or maltreatment.
20. CPS screening determinations during this period acknowledged concerns related to the child's functioning and emotional well-being while concluding that the reported conditions did not meet criteria for intervention.
21. CPS screening determinations during this period referenced parental disagreement, differences in parenting approach, or matters identified as appropriate for family court.
22. CPS issued screening determinations on May 15, 2025 and May 22, 2025 regarding reports involving N.D. The May 22, 2025 determination referenced concerns regarding the child's behaviors and functioning and stated that those concerns could not be directly connected to the other parent's conduct and were more appropriately addressed through family court.
23. Subsequent screening determinations issued by CPS did not reference or incorporate the May 22, 2025 determination or the information contained within it, and were issued without reference to prior determinations or previously submitted information.

### B. Asymmetry in CPS Reporting and Record Creation

24. Between May 2025 and March 2026, Plaintiff submitted multiple reports and related communications to CPS regarding N.D., including reports that were screened, reports classified as access notes, and additional submissions containing new information.
25. CPS records reflect nine reports submitted by Plaintiff, along with two entries classified as access notes rather than formal reports.
26. Additional submissions by Plaintiff containing new and relevant information were not incorporated into CPS records or reflected in screening determinations.
27. During the same period, one report was submitted by or on behalf of Elizabeth Duerr on June 23, 2025.
28. CPS issued screening determinations on the reports attributed to Plaintiff that were recorded within its system.
29. Information derived from the June 23, 2025 report was incorporated into and referenced within family court proceedings.
30. These classification and recordkeeping practices determined which information was preserved within CPS records and which information was excluded from consideration in subsequent determinations.

### C. June 14, 2025 – Documented Incident and Child's Response

31. On June 14, 2025, a custody exchange occurred between Plaintiff and Elizabeth Duerr. The exchange was recorded using multiple recording devices, including a phone camera, dashboard camera, interior vehicle camera, and audio recording.
32. The recordings show the presence of Gregory Mihm at the exchange location and include observable behavioral responses from the child during and immediately following the exchange.
33. Plaintiff submitted recordings of this exchange to CPS as part of subsequent reports.
34. CPS issued subsequent screening determinations following submission of these materials that did not reference or incorporate the recorded incident or the child's observable responses documented in the recordings.

### D. June 2025 – Pediatrician Report and CPS Determination

35. On June 17, 2025, Plaintiff submitted a complaint to Mayo Clinic requesting review of Dr. Forster's clinical conduct. Mayo Clinic acknowledged receipt of the complaint on June 17, 2025.
36. On June 23, 2025, Dr. Forster submitted a CPS report describing Plaintiff's communications as paranoid and delusional.
37. The June 23, 2025 CPS report did not include an independent clinical evaluation of the child and described Plaintiff's communications based on written portal messages.
38. The report stated that the basis for the concerns included statements attributed to Elizabeth Duerr, including statements that she did not feel safe around Plaintiff and that she had observed changes in his behavior.
39. CPS accepted and processed the June 23, 2025 report and issued a screening determination stating that the report did not establish reasonable suspicion or reasonable cause to believe that abuse or neglect had occurred.
40. The screening determination stated that the child was not demonstrating severe anxiety, depression, withdrawal, aggressive behavior, or substantial observable changes outside normal developmental expectations.
41. The information contained in the June 23, 2025 report was incorporated into CPS records and formed part of the information preserved within the CPS system.

### E. June 2025 – Supporting Documentation and Additional Reports

42. On June 24 and June 25, 2025, Plaintiff submitted additional reports and supporting materials to CPS describing concerns regarding the child's condition.
43. The June 24, 2025 report included video recordings of the June 14, 2025 exchange and materials documenting the child's behavioral and emotional response.
44. On June 24, 2025, CPS issued a screening determination stating that the information provided did not meet the statutory threshold for intervention. **(Ex. 5)**
45. The June 24, 2025 screening determination was issued one day after CPS received the June 23, 2025 report submitted by Dr. Forster.

46. The June 23, 2025 report described Plaintiff's communications as paranoid and delusional and included statements attributed to Elizabeth Duerr regarding changes in Plaintiff's behavior and possible prescription medication use.

47. The report identified those statements as based on information provided by Elizabeth Duerr and interpretation of Plaintiff's written communications, and did not include documentation of an independent clinical evaluation of the child.

48. CPS issued a screening determination on the June 25, 2025 submission stating that the information did not meet the statutory threshold for intervention.

49. Plaintiff underwent a drug test on May 28, 2025, which produced negative results. Plaintiff provided documentation of this result to CPS as part of materials submitted on August 18, 2025. Subsequent CPS screening determinations did not reference or incorporate the May 28, 2025 drug test.

50. On June 30, 2025, Plaintiff submitted written materials to CPS regarding neurodivergence, trauma-related risk, and behavioral presentation in children. CPS did not issue an updated or revised screening determination that referenced or incorporated the June 30, 2025 submission.

51. The June 30, 2025 submission and other materials referenced in this section were not incorporated into CPS records or reflected in subsequent screening determinations.

## F. June–August 2025 – Supervisory Notice and CPS Acknowledgments

52. On June 26, 2025, Plaintiff submitted a formal grievance to Eau Claire County DHS regarding CPS screening decisions and related practices. The submission was sent by email and included a completed grievance form and multiple attachments documenting concerns regarding CPS screening determinations, the June 14, 2025 custody exchange, threatening communications, educational records, denial of evaluations, and the child's behavioral responses. The submission was addressed to Defendant Bohl and copied to Defendants Christopherson and Brown. The submission requested internal review and inclusion of all submitted materials into the official CPS record. **(Ex. 1)**

53. CPS did not issue any revised screening determination incorporating the materials submitted with the June 26, 2025 grievance and did not incorporate those materials into subsequent screening determinations.

54. On June 30, 2025, Defendant Bohl issued a written response acknowledging receipt of Plaintiff's submission and supporting documentation, and copied Defendant Christopherson. The correspondence stated that the matter had been reviewed to determine whether it constituted a complaint or a grievance and classified the submission as a complaint. The correspondence further stated that Defendant Christopherson would review whether appropriate policies and procedures were followed. **(Ex. 2)**

55. On July 14, 2025, Plaintiff submitted a written follow-up to Defendants Terri Bohl and Melissa Christopherson referencing the June 26 grievance, the June 30 classification decision, and additional developments substantiating the concerns previously reported, including institutional actions and consequences arising after CPS declined intervention. On July 15, 2025, Defendant Christopherson personally responded, stating that she had reviewed the screening determinations "related to all CPS reports" and confirming that "the information provided did not meet the statutory criteria for Child Protective Services (CPS) intervention" and did not indicate present or impending danger. Defendant

Christopherson further directed Plaintiff to continue pursuing the matter through family court. This response constituted an affirmative supervisory review and adoption of prior screening determinations after receipt of updated and corroborating information, and did not issue a revised determination or incorporate the additional information into CPS records or determinations. **(Ex. 3 at 1–3)**.

56. On August 18, 2025, Plaintiff submitted a written rebuttal to the June 23, 2025 CPS report along with supporting materials.

57. On August 29, 2025, Defendant Bohl issued written correspondence regarding the June 23, 2025 CPS report. **(Ex. 4)**

58. The correspondence stated that CPS reports reflect unverified allegations, that no findings are made when a report is screened out, and that such reports should not be considered factual information or used as evidence in family court proceedings. **(Ex. 4)**

59. The correspondence stated that CPS would not intervene in how such reports were used in court. **(Ex. 4)**

60. Subsequent CPS screening determinations continued to be issued without clarification or limitation regarding the use of such determinations, and CPS did not issue any revised or clarifying determination addressing how previously issued reports or determinations should be interpreted or relied upon. **(Ex. 3; Ex. 4; Ex. 6)**

## G. June–August 2025 – Change in Attribution of CPS-Related Allegations

61. In a June 2025 filing, concerns associated with the CPS report were described as statements attributed to a parent.

62. In an August 2025 filing, those same concerns were described as statements attributed to the child's pediatrician.

63. Both filings referenced information derived from the June 23, 2025 CPS report.

64. The August 2025 filing presented the same underlying information as originating from a medical provider and mandatory reporter rather than from a parent.

65. This change in attribution reflected a shift in how information derived from the June 23, 2025 CPS report was characterized in subsequent proceedings.

## H. September 2025 – Continued Reports and Screening Determinations

66. In September 2025, Plaintiff submitted additional reports to CPS, including photographs, written descriptions, and information regarding the child's condition.

67. CPS issued screening determinations stating that the information did not indicate abuse or neglect under Wisconsin law or reflected parental disagreement or custody issues.

68. CPS records reflect that these submissions were received and reviewed, including communications sent to supervisory personnel.

69. The screening determinations issued during this period did not reference or incorporate prior submissions or previously reported information regarding the child's condition and functioning.

## I. September 2025 – Use of CPS Determinations in Family Court Proceedings

70. During family court proceedings in September 2025, CPS screening determinations were referenced in testimony and argument.
71. Statements were made in court that Plaintiff's CPS reports had not been substantiated.
72. The June 23, 2025 CPS report was offered and discussed in family court proceedings.
73. Plaintiff stated during those proceedings that CPS reports reflect unverified allegations and should not be treated as factual evidence.
74. CPS screening determinations and related reports were presented and referenced in court as indicators of the presence or absence of harm or risk to the child.
75. These references included statements connecting CPS screening outcomes to the validity of reported concerns and the assessment of risk.

## J. January 2026 – Report of Absence of Oversight

76. On January 29, 2026, Plaintiff submitted a report stating that no system was monitoring or verifying the child's condition, services, or safety.
77. The report referenced prior submissions and ongoing concerns regarding the child's condition and lack of intervention.
78. On January 30, 2026, CPS issued a screening determination stating that the information had previously been received and did not meet statutory criteria for intervention.
79. The January 30, 2026 screening determination did not reference or incorporate the reported absence of monitoring or verification of the child's condition, services, or safety.
80. This determination treated the reported absence of monitoring as information previously received without issuing any revised or updated assessment addressing that condition.

## K. February–March 2026 – Regression and Denial of Educational Services

81. In early 2026, school-based assessments documented changes in the child's literacy performance across multiple domains.
82. The school identified the need for additional educational evaluations.
83. On February 18, 2026, consent for those evaluations was denied.
84. The evaluations were available through the public school system at no cost.
85. CPS did not issue an updated or revised screening determination that referenced or incorporated the documented regression or denial of evaluations.
86. CPS did not provide any clarifying or supplemental determination addressing these developments or incorporating this information into CPS records or subsequent determinations.
87. In its March 4, 2026 screening determination, CPS expressly acknowledged that the report identified a decline in the child's educational progress and educational regression. CPS determined that the report did not meet criteria for intervention and stated that the matter should be addressed through family court proceedings. **(Ex. 6)**
88. This determination followed Plaintiff's January 29, 2026 submission identifying that no system was actively monitoring or verifying the child's condition, as described in paragraphs **76–79**. The March 4, 2026 submission provided updated information reflecting continued regression under those conditions. CPS issued a determination that no intervention was warranted despite prior notice that no system was monitoring or

verifying the child's condition and that existing processes were not providing oversight or intervention.

89. The March 4, 2026 determination incorporated the reported regression while maintaining the same screening classification as prior determinations. **(Ex. 6)**

## L. February 2026 – Request for Clarification

90. On February 16, 2026, Plaintiff submitted a written request to CPS seeking clarification regarding prior screening determinations.
91. The request referenced the absence of monitoring, denial of recommended services, and documented regression.
92. CPS did not provide a response or issue any clarifying or revised screening determination addressing this request or incorporating the identified conditions into CPS records or subsequent determinations.

## M. Judicial Findings Referencing CPS-Related Information

93. During family court proceedings in September and October 2025, CPS screening determinations were cited in argument.
94. On October 10, 2025, the court entered an order referencing Plaintiff's pattern of filing complaints against professionals.
95. The order referenced concerns regarding whether Plaintiff's prescription medications were present on drug tests.
96. The concerns referenced in the order correspond to statements contained in the June 23, 2025 CPS report, as described in paragraphs **36–38**.
97. The order referenced Plaintiff's interactions with providers and decision-making in connection with custody determinations.
98. The court's findings incorporated information and characterizations that had been presented in connection with CPS reports and screening determinations.
99. These references formed part of the court's evaluation of Plaintiff's credibility and decision-making.

## N. Additional Reports Not Logged or Classified

100. Between June 2025 and early 2026, Plaintiff submitted additional reports and communications to CPS containing information regarding the child's condition and services.
101. CPS acknowledged receipt of some of these submissions through its intake process.
102. CPS records produced in response to Plaintiff's records request do not include all submissions made during this period, including submissions containing new and relevant information.
103. CPS classified certain submissions as "duplicate" or "previously received."
104. CPS did not issue screening determinations for certain submissions and did not incorporate those submissions into CPS records or subsequent screening determinations.

105.    These submissions occurred during the same period in which CPS issued screening determinations on other reports that were recorded within the CPS system.

106.    These intake, classification, and recordkeeping practices determined which information was preserved within CPS records and which information was excluded from consideration in subsequent determinations.

107.    These practices resulted in CPS records and determinations that did not reflect all information submitted regarding the child's condition and reported risks, including information that was not incorporated into CPS records or screening determinations.

## O. Related State Court Proceedings

108.    Orders entered in the underlying family court proceedings are currently under review before the Wisconsin Court of Appeals in Case No. 2025AP001824.

109.    The claims asserted in this action arise from conduct of Defendants as a child-protection agency.

110.    Resolution of this action does not require modification or reversal of any state court order.

111.    Plaintiffs do not seek to challenge the validity of any state court order, but instead challenge the conduct of Defendants in creating and maintaining records and determinations that were used within those proceedings.

# V. CLAIMS FOR RELIEF

# COUNT I

**§1983 – Substantive Due Process (Deliberate Indifference / State-Created Danger)**

112.    Defendants, acting under color of state law, had actual knowledge of a substantial risk of harm to N.D., as reflected in paragraphs **24–30, 36–41, 42–49, and 66–69**, which describe repeated reports, supporting documentation, supervisory notice, and observed changes in the child's condition.

113.    Defendants responded to this information by issuing screening determinations that characterized the reported conditions as not meeting criteria for intervention and by classifying or excluding additional submissions containing new and corroborating information, as described in paragraphs **19–23, 44, 48, 50–51, 53, 60, and 100–106**.

114.    Through these determinations and classification practices, Defendants controlled what information was recorded, preserved, and communicated within systems that relied on CPS determinations.

115.    These actions included repeated official determinations stating that no threatened harm existed and classification practices that prevented new information from triggering reassessment or intervention.

116.    Defendants issued screening determinations that affirmatively characterized the reported conditions as insufficient to warrant protective concern, applying a classification

framework that excluded service obstruction, educational concerns, and regression from the category of threatened harm regardless of evidentiary content.

117.    Defendants' conduct was not merely passive. By issuing repeated screening determinations stating that no threatened harm existed despite receiving escalating and corroborated information, Defendants affirmatively communicated that the reported conditions did not warrant protective concern.

118.    By accepting and processing the June 23, 2025 CPS report, which was based on statements attributed to Elizabeth Duerr, while issuing screening determinations on reports submitted by Plaintiff and excluding additional submissions containing corroborating information, Defendants created an asymmetric informational environment in which unverified allegations were preserved while substantiated concerns were excluded, as described in paragraphs **36–41 and 24–30**.

119.    By acknowledging in writing that CPS reports are unverified and should not be used as evidence in court, while declining to correct or clarify their use in ongoing proceedings, Defendants maintained an informational environment in which such reports could function as indicators of credibility and risk, as reflected in paragraphs **57–59**.

120.    Defendants' screening determinations were issued in the context of ongoing family court proceedings and were reasonably expected to be relied upon as indicators of risk and credibility, as reflected in paragraphs **70–75 and 93–99**.

121.    Defendants' conduct, including the issuance of determinations and the selective recording, classification, and omission of information, demonstrates deliberate indifference to a known and escalating risk of harm.

122.    As a direct result, N.D. remained without necessary services or protective intervention, while decisions affecting custody, evaluation, and access to care were made within an informational environment shaped by Defendants' determinations.

123.    Defendants' repeated issuance of official screening determinations, combined with the selective recording and omission of information, functioned as affirmative state action that **replaced uncertainty with an official state-endorsed signal of safety**, communicated the absence of risk to other decision-makers, and **altered how those decision-makers responded to reported conditions affecting N.D.**

124.    Defendants' conduct rendered N.D. **less safe than if Defendants had taken no action at all**, as the repeated issuance of screening determinations and maintenance of CPS records affirmatively communicated that no protective concern existed, thereby influencing how other state actors evaluated risk and responded to reported conditions.

## COUNT II

**42 U.S.C. § 1983 – Procedural Due Process**

125.    Plaintiffs incorporate all preceding paragraphs.

126.    Plaintiffs had a protected liberty interest in **family integrity and in decisions affecting the care, custody, and access to services necessary for the child's well-being**, which were impacted by CPS determinations and records that informed and influenced subsequent decision-making processes.

127.    Defendants deprived Plaintiffs of that liberty interest by maintaining practices under which submitted reports and supporting materials were not consistently recorded,

evaluated, or incorporated into CPS determinations, resulting in the creation of an incomplete and misleading official record that was relied upon in decisions affecting the child, as described in paragraphs **44, 48, 50–51, 53, 78–80, 81–86, and 100–106**.

128.    Defendants further deprived Plaintiffs of that interest by failing to provide any mechanism through which screening determinations could be reviewed, clarified, or reconsidered after submission of additional information that was not incorporated into CPS records or determinations.

129.    On February 16, 2026, Plaintiff submitted a written request seeking clarification of CPS determinations and the basis for concluding that documented regression, denial of services, and absence of monitoring did not constitute threatened harm, as described in paragraphs **90–92**.

130.    Defendants did not respond to that request and did not provide any process by which the underlying determinations could be reviewed, clarified, or challenged.

131.    Through these practices, Defendants rendered the reporting and review process functionally unavailable by preventing new information from being incorporated into CPS records or reflected in subsequent determinations.

132.    As a result, Plaintiffs were deprived of procedural due process under the Fourteenth Amendment.

## COUNT III

**42 U.S.C. § 1983 – Denial of Meaningful Access to Courts**

133.    Plaintiffs incorporate all preceding paragraphs.

134.    Defendants' conduct impaired Plaintiffs' access to a fair and meaningful adjudicative process by issuing and maintaining CPS determinations and records that allowed unverified information to function as substantive indicators of credibility and risk within ongoing family court proceedings.

135.    As described in paragraphs **36–41**, the June 23, 2025 CPS report incorporated statements attributed to Elizabeth Duerr describing Plaintiff as exhibiting paranoia, delusion, and possible prescription medication misuse, without an independent clinical evaluation of the child.

136.    As described in paragraphs **61–65**, information derived from that report was subsequently presented in court filings as originating from a medical provider rather than from a parent.

137.    As described in paragraphs **70–75 and 93–99**, CPS screening determinations and related information were cited and relied upon in family court proceedings, including in judicial findings referencing Plaintiff's conduct, prescription medication use, and interactions with professionals.

138.    As described in paragraphs **57–59**, Defendants acknowledged that CPS reports reflect unverified allegations and do not constitute findings of maltreatment, while declining to clarify or limit how such reports and determinations were used in court proceedings.

139.    Through these actions, Defendants maintained records and determinations that allowed unverified allegations to be transformed and relied upon as substantive inputs affecting judicial decision-making.

140.  This occurred within a system in which Defendants controlled what information was recorded, preserved, and available to other decision-makers, including the exclusion of additional reports and supporting information described in paragraphs **100–106**.

141.  Plaintiffs were unable to effectively rebut or correct these distortions because Defendants controlled the creation, maintenance, and content of CPS records, which were relied upon in court proceedings and not subject to meaningful correction through the CPS process.

142.  The right of access to the courts includes the right to a fair and meaningful opportunity to present claims within an adjudicative system that is not distorted by state action.

143.  Defendants' conduct impaired that right by:
- issuing and maintaining screening determinations that functioned as indicators of credibility and risk,
- failing to distinguish between unverified allegations and evaluated information within CPS records, and
- declining to clarify the meaning and limitations of CPS screening determinations despite knowledge of their use in court proceedings.

144.  Defendants knew or should have known that CPS determinations are routinely relied upon by family courts, guardians ad litem, and other decision-makers.

145.  By maintaining and repeating screening determinations without clarification in the context of ongoing proceedings, Defendants contributed to the alteration of the informational landscape in which judicial decisions affecting N.D. were made.

146.  This conduct foreseeably impaired Plaintiffs' ability to obtain fair consideration of child safety concerns, service needs, and risk factors affecting the child.

147.  Defendants' conduct violated clearly established constitutional principles prohibiting the creation and use of materially misleading state-generated information in proceedings affecting protected liberty interests, including decisions related to custody, care, and child welfare.

148.  As a result, Plaintiffs were denied meaningful access to the courts in violation of the Constitution, including impacts on assessments of Plaintiff's credibility, the perceived validity of reported concerns, and the necessity of protective or evaluative interventions.

# COUNT IV

### 42 U.S.C. § 1983 – Municipal Liability (Monell)

149.  Plaintiffs incorporate all preceding paragraphs.

150.  The constitutional violations described herein were caused by policies, customs, or practices of Eau Claire County DHS, including:
- a practice of screening out reports involving service disruption, educational concerns, or alleged harm as matters appropriate for family court,
- failure to train CPS personnel to recognize service obstruction, educational concerns, and regression as conditions requiring evaluation under CPS standards,
- a custom of treating new reports as duplicative without evaluating new factual developments, and

- practices relating to intake and recordkeeping, including failure to log, process, or evaluate submitted reports containing new information.

151.    These policies and practices resulted in the repeated issuance of screening determinations without incorporation of new information and the exclusion of submitted materials from CPS records, as described in paragraphs **19–23, 44, 48, 50–51, 53, and 100–106**, resulting in CPS records that were incomplete and relied upon in subsequent decision-making processes.

152.    Supervisory Defendants had actual knowledge of these practices through repeated escalations and direct communications. As described in paragraphs 52–55, Plaintiff submitted a formal grievance and follow-up communications identifying concerns regarding CPS screening determinations and recordkeeping practices. Defendant Bohl classified the grievance as a complaint and referred it for supervisory review, and Defendant Christopherson personally reviewed the screening determinations and confirmed them without issuing any revised determination or incorporating additional information into CPS records. This review occurred after Defendants had received detailed supporting documentation and did not result in any modification of CPS records or determinations.

153.    As further described in paragraphs **57–59**, supervisory personnel acknowledged in writing that CPS reports reflect unverified allegations and do not constitute findings of maltreatment, while declining to clarify or limit how such reports and determinations were used in court proceedings.

154.    Despite this knowledge, Defendants maintained the same screening determinations and recordkeeping practices across multiple reports submitted over time regarding the same child, applying substantially similar reasoning and classification outcomes regardless of new and evolving information. This pattern reflects an established custom or standard operating approach rather than isolated discretionary decisions. This pattern persisted following supervisory review and acknowledgment of the limitations of CPS determinations.

155.    These policies, customs, and practices were the moving force behind the constitutional violations suffered by Plaintiffs.

---

## VI. PRAYER FOR RELIEF

Plaintiffs respectfully request:

A. Declaratory judgment that Defendants violated Plaintiffs' federal rights;
B. Injunctive relief requiring corrective policies and practices and prohibiting conduct that renders reporting and review processes functionally unavailable.
C. Compensatory damages;
D. Punitive damages against individual Defendants;
E. Costs and fees under 42 U.S.C. § 1988;
F. Any other relief the Court deems just.

## VII. JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,
Dated: April 1, 2026

**Shaun P. Duerr, Pro Se**
Plaintiff, Individually and as Next Friend of N.D.
5800 American Blvd W, Apt 216
Bloomington, MN 55437
Tel: (630) 308-0462
Email: sduerr85@gmail.com